IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| LARRY NORSWORTHY, #149693, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 2:08-CV-222-WHA |
| | ) | [WO] |
| | ) | |
| ALABAMA DEPARTMENT OF | ) | |
| CORRECTIONS, et al, | ) | |
| | ) | |
| Defendants. | ) | |

## RECOMMENDATION OF THE MAGISTRATE JUDGE

## I.  INTRODUCTION

This 42 U.S.C. § 1983 action is before the court on a complaint filed by Larry Norsworthy ["Norsworthy"], a state inmate, against the Alabama Department of Corrections, Prison Health Services, Inc., the previous health care provider for the state prison system; Correctional Medical Services, Inc., the system's current health care provider; Richard Allen, the commissioner of the Alabama Department of Corrections; Mr. Barrett, a current assistant warden at Staton Correctional Facility; Jerry Miller and Pete Hamm, correctional officers at the Elmore Correctional Facility; Leon Forniss, the warden of Staton Correctional Facility; Dr. Paul Corbier, a physician board-certified in internal medicine employed as medical director at Staton; and Domineek Guice, a certified

registered nurse practitioner assigned to Staton.[1]  In this complaint, Norsworthy asserts that the correctional defendants acted with deliberate indifference to his safety by failing to provide adequate training for and supervision of his work at the Elmore Recycling Plant, which resulted in his suffering a prick to his finger.  Norsworthy further complains that the defendants failed to provide adequate medical treatment for this injury and his subsequent positive test result for the Hepatitis B core antibody.  In addition, he makes the conclusory allegation that the defendants discriminated against him.  Norsworthy seeks declaratory relief, treatment at a private medical facility, and monetary damages for the alleged violations of his constitutional rights.  *Plaintiff's Complaint - Court Doc. No. 1* at 4.

The defendants filed special reports, supplemental reports, answers and supporting evidentiary materials addressing Norsworthy's claims for relief.  Pursuant to the orders entered herein, the court deems it appropriate to treat these reports as motions for summary judgment.  *Order of June 26, 2008 - Court Doc. No. 32*; *Order of November 3, 2010 - Court Doc. No. 49*.  Thus, this case is now pending on the defendants' motions for summary judgment.  Upon consideration of these motions, the evidentiary materials filed by the defendants in support of the motions and the plaintiff's responses in opposition to the reports/motions, the court concludes that the defendants' motions for summary judgment are due to be granted.

---

[1]Counsel for the correctional defendants informs the court that although the plaintiff lists warden Louis Barrett as a defendant, this individual's proper name is Bobby Barrett. In the interest of clarity and for purposes of this Recommendation, the court will refer to this defendant by his surname.

## II.  SUMMARY JUDGMENT STANDARD OF REVIEW

"Summary judgment is appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'"  *Greenberg v. BellSouth Telecomm., Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007) (per curiam) (citation to former rule omitted); Fed.R.Civ.P. Rule 56(c) (Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.").[2]  The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the [record, including pleadings, discovery materials and affidavits], which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The movant may meet this burden by presenting evidence indicating there is no dispute of material fact or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof.  *Id.* at 322-324.

---

[2]Effective December 1, 2007, "[t]he language of Rule 56 [was] amended ... to make the rule[] more easily understood and to make style and terminology consistent throughout the rules.  These changes ... are stylistic only." Fed.R.Civ.P. 56 Advisory Committee Notes.  Thus, although Rule 56 underwent stylistic changes, its substance remains the same and, therefore, all cases citing the prior rule remain equally applicable to the current rule.

The defendants have met their evidentiary burden and demonstrated the absence of any genuine issue of material fact. Thus, the burden shifts to the plaintiff to establish, with appropriate relevant evidence beyond the pleadings, that a genuine issue material to his case exists. *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *Celotex*, 477 U.S. at 324; Fed.R.Civ.P. 56(e)(2) ("When a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must ... set out specific facts showing a genuine issue for trial."). A genuine issue of material fact exists when the nonmoving party produces evidence that would allow a reasonable fact-finder to return a verdict in its favor. *Greenberg*, 498 F.3d at 1263.

> In civil actions filed by inmates, federal courts
>
> must distinguish between evidence of disputed facts and disputed matters of professional judgment. In respect to the latter, our inferences must accord deference to the views of pison authorities. Unless a prisoner can point to sufficient evidence regarding such issues of judgment to allow him to prevail on the merits, he cannot prevail at the summary judgment stage.

*Beard v. Banks*, 548 U.S. 521, 530, 126 S.Ct. 2572, 2578, 165 L.Ed.2d 697 (2006) (internal citation omitted). Consequently, to survive the defendants' properly supported motions for summary judgment, Norsworthy is required to produce "sufficient [favorable] evidence" which would be admissible at trial supporting his claims for relief. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); Rule 56(e)(1), *Federal Rules of Civil Procedure*. "If the evidence [on which the nonmoving party relies] is merely colorable ... or is not

4

significantly probative ... summary judgment may be granted." *Id*. at 249-250. "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the [trier of fact] could reasonably find for that party. *Anderson v. Liberty Lobby*, 477 U.S. 242, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986)." *Walker v. Darby*, 911 F.2d 1573, 1576-1577 (11th Cir. 1990). Conclusory allegations based on subjective beliefs are likewise insufficient to create a genuine issue of material fact and, therefore, do not suffice to oppose a motion for summary judgment. *Waddell v. Valley Forge Dental Associates, Inc.*, 276 F.3d 1275, 1279 (11th Cir. 2001); *Holifield v. Reno*, 115 F.3d 1555, 1564 n.6 (11th Cir. 1997) (the plaintiff's "conclusory assertions ..., in the absence of [admissible] supporting evidence, are insufficient to withstand summary judgment."); *Harris v. Ostrout*, 65 F.3d 912, 916 (11th Cir. 1995) (grant of summary judgment appropriate where inmate produces nothing beyond "his own conclusory allegations" challenging actions of the defendants); *Fullman v. Graddick*, 739 F.2d 553, 557 (11th Cir. 1984) ("mere verification of party's own conclusory allegations is not sufficient to oppose summary judgment...."). The law is well settled that when a plaintiff fails to set forth specific facts supported by requisite evidence sufficient to establish the existence of an element essential to his case and on which the plaintiff will bear the burden of proof at trial, summary judgment is due to be granted in favor of the moving party. *Celotex*, 477 U.S. at 322 ("[F]ailure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."); *Barnes v.*

5

*Southwest Forest Industries, Inc.*, 814 F.2d 607, 609 (11th Cir. 1987) (if on any part of the prima facie case the plaintiff presents insufficient evidence to require submission of the case to the trier of fact, granting of summary judgment is appropriate).

For summary judgment purposes, only disputes involving material facts are relevant. *United States v. One Piece of Real Property Located at 5800 SW 74th Avenue, Miami, Florida*, 363 F.3d 1099, 1101 (11th Cir. 2004). What is material is determined by the substantive law applicable to the case. *Anderson*, 477 U.S. at 248 ("Only disputes over the facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted."); *Lofton v. Secretary of the Department of Children and Family Services*, 358 F.3d 804, 809 (11th Cir. 2004) ("Only factual disputes that are material under the substantive law governing the case will preclude entry of summary judgment."). "By its very terms, [the summary judgment] standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson*, 477 U.S. at 247-248 (emphasis in original); *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1243 (11th Cir. 2003) ("Only disputes of material fact are important at summary judgment. 'The mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is material to an issue affecting the outcome of the case.... A genuine issue of material fact does not exist

unless there is sufficient evidence favoring the nonmoving party for a reasonable [trier of fact] to return a verdict in its favor.'"). "At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts. *Fed. Rule Civ. Proc.* 56(c)." *Scott v. Harris*, 550 U.S. 372, 380, 127 S.Ct. 1769,1776 (11th Cir. 2007). To demonstrate a genuine issue of material fact, the party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts.... Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (footnote omitted); *Scott*, 550 U.S. at 380, 127 S.Ct. at 1776 (same). In cases where the evidence before the court which is admissible on its face or which can be reduced to admissible form indicates that there is no genuine issue of material fact and that the party moving for summary judgment is entitled to it as a matter of law, summary judgment is proper. *Celotex*, 477 U.S. at 323-324 (summary judgment appropriate where pleadings, evidentiary materials and affidavits before the court show there is no genuine issue as to a requisite material fact); *Waddell*, 276 F.3d at 1279 (to establish a genuine issue of material fact, the nonmoving party must produce evidence such that a reasonable trier of fact could return a verdict in his favor). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable juror could believe it, a court should not adopt that version of the facts for purposes of ruling on a

motion for summary judgment." *Scott*, 550 U.S. at 380, 127 S.Ct. at 1776.

Although factual inferences must be viewed in a light most favorable to the nonmoving party when "there is a 'genuine' dispute as to those facts[,]" *id*., and *pro se* complaints are entitled to liberal interpretation by the courts, no party, even a *pro se* litigant, escapes the burden of establishing by sufficient evidence a genuine issue of material fact.[3]  *Beard*, 548 U.S. at 525, 126 S.Ct. at 2576; *Brown v. Crawford*, 906 F.2d 667, 670 (11th Cir. 1990).  Despite the existence of some factual disputes in this case, Norsworthy fails to demonstrate a requisite genuine issue of material fact with respect to his claims for relief in order to preclude summary judgment.  *Matsushita*, *supra*.

## III.  DISCUSSION

### A.  Facts[4]

On August 24, 2006, the job board at the Elmore Correctional Facility assigned Norsworthy to work at the facility's recycling plant. Prior to beginning this work assignment, Norsworthy attended an inmate orientation session, at which time he viewed a video containing detailed information regarding the recycling center.[5]  The undisputed

---

[3]The plaintiff filed this complaint while acting as a *pro se* litigant.  However, prior to filing his response to the defendants' answers and reports in opposition to his complaint, the plaintiff has been and is now represented by counsel.

[4]The facts are taken from the affidavits submitted by the plaintiff in support of his complaint/response and the medical records compiled contemporaneously with the treatment provided to the plaintiff.

[5]Norsworthy acknowledges that he underwent orientation, during which he watched the instructional video before his first day of work at the recycling plant.  *Plaintiff's Affidavit in Support of Complaint - Court Doc. No. 1* at 6.

affidavit of Willie Thomas, the warden of Elmore Correctional Facility, explains the

information provided to inmates during the orientation session as follows:

> ... [T]his orientation includes watching a video to receive information
> about the Recycling Center. The orientation includes the hazards at the
> Recycling Center and the proper handling of most incidents as they occur.
> This includes coming in contact with blood borne pathogens and chemical
> handling. Inmates are also instructed on the following:
>
> 1. Safety Equipment: No inmate will be required to work at the
> Recycling Center without proper protective equipment. This equipment
> includes nitrile gloves (a puncture resistant glove), safety glasses, dust masks
> and kevlar sleeves. This orientation also encourages each inmate assigned
> to the Recycling Center to use the protective equipment provided. Each
> inmate is given instructions to get gloves before reporting to the sorting line.
> All gloves used at the Recycling Center are washed after each shift to
> promote a healthier work environment. When gloves become cut, torn or
> badly worn, they are removed from use at the Recycling Center and
> destroyed.
>
> 2. Recycling Materials: During the initial orientation, each inmate
> receives instructions about the various types of materials received at the
> Recycling Center. Inmates are orientated that should any medical waste
> arrive at the Recycling Center, they are to immediately notify the officers for
> the officers to remove the waste and dispose of it properly. Medical waste
> rarely arrives at the Recycling Center. Occasionally, a diabetic syringe will
> come through the trash. When this occurs, the inmates are instructed to
> notify the officers for the officers to remove the syringe.
>
> 3. Emergency Equipment: Every inmate assigned to the Recycling
> Center is given instructions on the location and use of the emergency eye
> wash station and the emergency wash station. Inmates assigned to the
> Recycling Center will be shown the location of each wash station and the
> proper way to use the different stations.
>
> 4. The video also has a segment about blood borne pathogens. This
> video informs inmates how to manage contact with blood borne pathogens,
> should exposure occur. Inmates are again instructed to notify the officers
> immediately if they come in contact with any blood borne pathogens. The
> video also covers the ways blood borne pathogens are transmitted and the
> proper medical procedures to take should an inmate come into contact with
> any blood borne pathogens. Any time an inmate notifies an officer at the

Recycling Center that he has been cut by an object, or stuck by an object, they are immediately taken to Staton Health Care Unit for medical attention. No blood has to be present for the inmate to be taken for medical attention. Any time an inmate notifies the officer that he has been stuck by a known or unknown object, an incident report is completed, and the medical treatment form is attached.

5.  Inmates are also instructed on the proper procedure to follow should any chemicals arrive at the Recycling Center.  Every inmate is instructed to immediately notify the officer in charge of the presence of the chemical and let the officer remove the chemical.

6.  Equipment used at the Recycling Center: Every inmate receives instructions about the various types of equipment used at the Recycling Center.  This is done at the time the inmate checks out to work for the first time.  At this time, the inmate is again instructed on the safety equipment available for them.  All inmates assigned to the Recycling Center are given the opportunity to ask any questions they have before being placed on a job for the day.

* * *

Inmates assigned to the Recycling Center are assigned to work four (4) hour shifts and are checked back in at the Back Gate for the day.  The exception to this is the Maintenance inmates.  Those inmates work the full day.  The officers assigned to the Recycling Center closely monitor inmate activity at the Recycling Center.

[Norsworthy was assigned to the sorting line, one of several primary jobs, at the Recycling Center.]  There are approximately eighty (80) stations where the inmates sit along the sorting line and pull various types of recycling materials and place them into a bin for that product.  The products that Elmore Correctional Center recycles are clear plastic, colored plastic, newspaper, various other types of paper, cardboard, tin cans and aluminum cans.

* * *

There is one Lieutenant assigned to the Recycling Center and Inmate Control Systems Office (ICS). The responsibility of the Lieutenant is to supervise the overall operation of the Recycling Center and to keep accurate records of the materials being brought in the Recycling Center and taken to various mills from the Recycling Center.  The Lieutenant is responsible for ensuring that all safety materials are ordered and kept on hand for daily operations of the Center.  The Lieutenant also orders all materials needed for bailing the materials at the Recycling Center.  The Lieutenant is responsible

10

for ordering necessary repairs to the equipment at the Recycling Center (bailers, forklift, conveyors, electrical, etc.).
* * *

     Every effort is taken daily to ensure that the Recycling Center is run in an efficient, safe and productive manner.  At no time will any inmate be allowed or required to work around any equipment that is in need of repair.  At no time will inmates be knowingly allowed to possess any type medical instruments (syringes, needles, etc.) or medication of any type at the Recycling Center.  Any inmate who is required to take mental health medications is screened to ensure that [the] inmate can safely work [at] the Recycling Center.  Those inmates determined not to be able to work at the Recycling Center will not be assigned to a job at the Recycling Center....

*Correctional Defendants' Exhibit G to the October 10, 2008 Supplemental Special Report*

*(October 8, 2008 Affidavit of Willie Thomas) - Court Doc. No. 43-1* at 1-5.

     On November 21, 2005, December 19, 2005 and June 6, 2006, Norsworthy received vaccines for Hepatitis B. *Medical Defendants' Exhibit B to the May 6, 2008 Special Report (Medical Records of Larry Norsworthy) - Court Doc. No. 18-2* at 127-129.  On or about August 28, 2006, his first day of work at the recycling plant, Norsworthy obtained a pair of protective gloves and a dust mask, then reported to work on the sorting line in accordance with the instructions of defendant Miller.  Norsworthy alleges that the gloves "were in poor condition, most had the protective yellow coating missing in places." *Plaintiff's Affidavit in Support of Complaint - Court Doc. No. 1* at 5.  Norsworthy, however, did not report the condition of the gloves to correctional officials.  On August 30, 2006, while sorting materials on the conveyor belt, Norsworthy felt a "sharp sting to [his] finger" and observed "a small drop of blood."  *Id*. at 5-6.  Norsworthy reported the incident to

defendant Miller who advised Norsworthy to proceed "across the street" to Staton Correctional Facility, the facility at which the health care unit is located, for a required strip search prior to his transport for a medical evaluation.. *Id*. at 6. While awaiting the search, Norsworthy asserts that he informed defendant Hamm of his "puncture wound" and Hamm "sent [the inmate] to the back-gate where [he] was then taken to the Health Care Unit." *Id*. The incident report indicates that "[o]n 8-30-06 at approximately 1:55 p.m., inmate Larry Norsworthy ... informed Officer Howard Robinson that he (inmate Norsworthy) had allegedly stuck an unknown object in his right finger [while working at the Elmore Recycling Center]. Inmate Norsworthy stated he had on protective gloves and [threw the gloves] away. Officer Robinson observed a small area with dried blood. Inmate Norsworthy was transported to SHCU for medical evaluation...." *Correctional Defendants' Exhibit A to the May 28, 2008 Special Report (Incident Report ECC06-1293)  - Court Doc. No. 25-1* at 2.

After Norsworthy waited a couple of hours in the health care unit, a nurse examined him, and he advised her that an unknown object stuck his finger while he was working at the recycling plant. *Correctional Defendants' Exhibit A to the May 28, 2008 Special Report (Medical Evaluation Form of August 30, 2006) - Court Doc. No. 25-1* at 3; *Medical Defendants' Exhibit B to the May 6, 2008 Special Report (Medical Evaluation Form of August 30, 2006) - Court Doc. No. 18-2* at 28. The nurse noted "no bleeding ... no swelling or redness. No drainage noted to site. [Range of motion] present to finger. No [complaints

of] pain.  No [signs] of acute distress noted." *Id*.  The nurse was unable to draw blood at this time so Norsworthy returned to the health care unit the following morning and medical personnel obtained a blood sample.  Medical personnel forwarded this blood sample to LabCorp, a free-world laboratory testing facility in Birmingham, Alabama, for analysis. *Medical Defendants' Exhibit B to the May 6, 2008 Special Report (Medical Records of Larry Norsworthy) - Court Doc. No. 18-2* at 104-107.  This blood sample demonstrated negative test results for exposure to infectious viruses including Hepatitis A, Hepatitis B, Hepatitis C and HIV.  *Id*. at 107.  Correctional medical personnel obtained additional blood samples from Norsworthy on October 12, 2006 and November 21, 2006, and again referred these samples to LabCorp for analysis, which indicated negative results for exposure to infectious viruses.  *Id*. at 99-103.  Thereafter a blood sample obtained by correctional medical personnel from Norsworthy on February 15, 2007 indicated a positive result for the Hepatitis B core antibody.  *Id*. at 114.

On March 1, 2007, nurse Guice counseled Norsworthy regarding the positive test result for the Hepatitis B core antibody, informed Norsworthy of the meaning of this result – "a possible exposure to Hepatitis B" –  and advised him that "subsequent lab testing would be required in three months."  *Medical Defendants' Exhibit B to the May 6, 2008 Special Report (May 5, 2008 Affidavit of Domineek Guice) - Court Doc. No. 18-2* at 3; *Medical Defendants' Exhibit B to the May 6, 2008 Special Report (Medical Records of Larry Norsworthy) - Court Doc. No. 18-2* at 20.  Nurse Guice also advised Norsworthy of

13

the possible modes of transmission for Hepatitis A, Hepatitis B and Hepatitis C. *Id*. These included the exchange of bodily fluids and contact with the feces of another individual. *Plaintiff's Affidavit in Support of Complaint - Court Doc. No. 1* at 7. Norsworthy immediately informed defendant Guice that he could not have contracted Hepatitis B in either manner suggested because she had "the wrong man [for that], I'm not a homosexual." *Id*. Norsworthy then advised defendant Guice he believed he contracted "the virus from the needle puncture ... already reported." *Id*.

A blood sample obtained from Norsworthy on December 27, 2007 showed a negative test result for the Hepatitis B core antibody. In January of 2008 during his chronic care visit to the health care unit, defendant Guice advised Norsworthy of the negative test result and discussed with Norsworthy the possibility that the February 2007 test result was a false positive. *Medical Defendants' Exhibit B to the May 6, 2008 Special Report (May 5, 2008 Affidavit of Domineek Guice) - Court Doc. No. 18-2* at 3; *Medical Defendants' Exhibit B to the October 13, 2008 Supplemental Special Report (Medical Records of Larry Norsworthy) - Court Doc. No. 45-1* at 14. Due to questions posed by Norsworthy, nurse Guice referred him to Dr. Corbier for further discussion and explanation of his most recent negative blood test result. *Id*. Dr. Corbier evaluated Norsworthy on January 30, 2008, "discussed [the] Hepatitis panel" with him, explained the current negative result for exposure to Hepatitis B and advised Norsworthy that his Hepatitis panel was now "normal." *Medical Defendants' Exhibit B to the October 13, 2008 Special Report (Medical*

14

*Records of Larry Norsworthy) - Court Doc. No. 45-1* at 15.

Norsworthy asserts that the correctional defendants acted with deliberate indifference to his safety because they failed to adequately train and supervise him while he was assigned to the Elmore Recycling Center. He further complains that the defendants failed to provide him prompt and adequate medical treatment for the injury to his finger and upon his positive test result for the Hepatitis B antibody. Finally, Norsworthy alleges that the defendants discriminated against him.

### B.  The Alabama Department of Corrections

The law is well-settled that state agencies are absolutely immune from suit. *Papasan v. Allain*, 478 U.S. 265 (1986) (Unless the State or its agency consents to suit, the plaintiff cannot proceed against such defendant as the action is proscribed by the Eleventh Amendment and "[t]his bar exists whether the relief sought is legal or equitable."). Any claims lodged against the Alabama Department of Corrections are therefore frivolous as such claims are "based on an indisputably meritless legal theory." *Neitzke*, 490 U.S. at 327. In light of the foregoing, summary judgment is due to be granted in favor of this defendant.

### C.  Absolute Immunity

With respect to claims lodged against the defendants in their official capacities, these defendants are immune from monetary damages. Official capacity lawsuits are "in all respects other than name, ... treated as a suit against the entity." *Kentucky v. Graham*, 473 U. S. 159, 166 (1985). "A state official may not be sued in his official capacity unless the

state has waived its Eleventh Amendment immunity, *see Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 100, 104 S.Ct. 900, 908, 79 L.Ed.2d 67 (1984), or Congress has abrogated the state's immunity, *see Seminole Tribe v. Florida*, [517 U.S. 44, 59], 116 S.Ct. 1114, 1125, 134 L.Ed.2d 252 (1996).  Alabama has not waived its Eleventh Amendment immunity, *see Carr v. City of Florence*, 916 F.2d 1521, 1525 (11th Cir. 1990) (citations omitted), and Congress has not abrogated Alabama's immunity.  Therefore, Alabama state officials are immune from claims brought against them in their official capacities." *Lancaster v. Monroe County*, 116 F.3d 1419, 1429 (11th Cir. 1997).

In light of the foregoing, it is clear to the court that the individual defendants are state officials entitled to sovereign immunity under the Eleventh Amendment for all claims seeking monetary damages from them in their official capacities.  *Lancaster*, 116 F.3d at 1429; *Jackson v. Georgia Department of Transportation*, 16 F.3d 1573, 1575 (11th Cir. 1994). Thus, the defendants are entitled to absolute immunity from any claims for monetary relief presented against them in their official capacities.

### D.  Negligence

To the extent that the complaint can be construed to allege a claim of negligence with regard to the actions of the defendants in their operation of the Elmore Recycling Center and the provision of medical treatment, these claims entitle Norsworthy to no relief. The law is well settled that the Constitution is not implicated by negligent acts of an official causing unintended loss of life, liberty or property.  *Daniels v. Williams*, 474 U.S. 327

(1986); *Davidson v. Cannon*, 474 U.S. 344, 348 (1986) (protections of the Constitution "are just not triggered by lack of due care by prison officials."). Based on the foregoing, the court concludes that any claim based on alleged negligence of the defendants does not rise to the level of a constitutional violation and provides no basis for relief in this 42 U.S.C. § 1983 action.

### E. Claims Arising Under Prior Court Order Adopting Settlement Agreement

Norsworthy seeks relief from this court based on the defendants' alleged failure to follow the provisions of a settlement agreement entered by the parties and approved by order of this court in *Brinkley, et al., v. Harrelson, et al.*, Civil Action No. 2:01-CV-187-WHA (M.D. Ala. 2002). This claim, however, provides no basis for relief, as 42 U.S.C. § 1983 governs only violations of rights secured by either the United States Constitution or federal law. *Golden States Transit Corporation v. Los Angeles*, 493 U.S. 103 (1989); *Wilder v. Virginia Hospital Association*, 496 U.S. 498 (1990). Remedial orders of a federal court do not create rights enforceable under the Constitution or laws of the United States. *See Green v. McKaskle*, 788 F.2d 1116 (5th Cri. 1986); *see also DeGidio v. Pung*, 704 F.Supp. 922 (D.C. Minn. 1989) (agreeing with *McKaskle*), *aff'd on unrelated grounds*, 920 F.2d 525 (8th Cir. 1990). Moreover, the settlement agreement specifically states that "[t]his Settlement is not a consent decree, and is not enforceable in federal court. In the event of non-compliance with any terms of this Settlement Agreement, the Settlement Agreement may be only enforced in state court [for breach of contract]." *Brinkley, et al., v. Harrelson,*

*et al.*, Civil Action No. 2:01-CV-187-WHA-CSC (M.D. Ala. 2002) - *Court Doc. No. 35* at 19. Norsworthy concedes knowledge of this fact, as he submits a copy of the "Summary of Settlement Agreement" in support of his response to the defendants' special reports which specifically states that "[i]f the DOC does not comply with the terms of the Settlement Agreement, it can be sued in state court for breach of contract." *Plaintiff's Exhibit A to the September 8, 2008 Response to the Special Reports - Court Doc. No. 40-2* at 1. The court therefore concludes that, to the extent the plaintiff seeks relief from this court based on the correctional defendants alleged failure to abide by the terms of this prior settlement agreement, this agreement does not establish rights which are enforceable under 42 U.S.C. § 1983.

## F.  Claims Against Richard Allen

It is clear from a review of the complaint that defendant Allen is sued solely due to his position as Commissioner of the Alabama Department of Corrections. However, the law is well settled that "supervisory officials are not liable under § 1983 for the unconstitutional acts of their subordinates on the basis of respondeat superior or vicarious liability." *Miller v. King*, 384 F.3d 1248, 1261 (11th Cir. 2004); *Gonzalez v. Reno*, 325 F.3d 1228, 1234 (11th Cir. 2003) (concluding supervisory officials are not liable on the basis of respondeat superior or vicarious liability); *Hartley v. Parnell*, 193 F.3d 1263, 1269 (11th Cir.1999), citing *Belcher v. City of Foley*, 30 F.3d 1390, 1396 (11th Cir. 1994) (42 U.S.C. § 1983 does not allow a plaintiff to hold supervisory officials liable for the actions of

subordinates/employees under either a theory of respondeat superior or vicarious liability); *Cook ex rel. Estate of Tessier v. Sheriff of Monroe County, Florida*, 402 F.3d 1092, 1115-1116 (11th Cir. 2005) (a prisoner simply cannot rely on theories of vicarious liability or respondeat superior to establish liability). Thus, defendant Allen is liable in the present cause of action only if he "personally participate[d] in the alleged unconstitutional conduct or [if] there is a causal connection between [his] actions ... and the alleged constitutional deprivation." *Cottone v. Jenne*, 326 F.3d 1352, 1360 (11th Cir. 2003) (citation omitted).

Norsworthy does not allege that defendant Allen personally participated in the actions about which he complains. Additionally, it is undisputed that defendant Allen is not involved in either the daily operation of correctional facilities or the specific medical treatment provided to inmates confined in the state prison system. Moreover, Norsworthy fails to present any facts which indicate a causal relationship between an action undertaken or policy enacted by defendant Allen and the alleged constitutional deprivations. A supervisory official "may be liable only for implementing a policy that is 'itself [ ] a repudiation of constitutional rights' and 'the moving force of the constitutional violation.' *Grandstaff v. City of Borger*, 767 F.2d 161, 169, 170 (5th Cir.1985)." *Oliver v. Scott*, 276 F.3d 736 (5th Cir. 2006). Consequently, the claims lodged against defendant Allen lack an arguable basis in law and the entry of summary judgment in his favor is therefore appropriate.

## G. Discrimination

19

Norsworthy makes the conclusory allegation that he "is being discriminated against" by the defendants in violation of his right to equal protection. *Plaintiff's Complaint - Court Doc. No. 1* at 3.

To establish a claim cognizable under the Equal Protection Clause, "a prisoner must [at a minimum] demonstrate that (1) he is similarly situated to other prisoners who received more favorable treatment; and (2) the state engaged in invidious discrimination against him based on race, religion, national origin, or some other constitutionally protected basis. *Jones v. Ray*, 279 F.3d 944, 946-47 (11th Cir. 2001); *Damiano v. Florida Parole and Prob. Comm'n*, 785 F.2d 929, 932-33 (11th Cir. 1986)." *Sweet v. Secretary, Department of Corrections*, 467 F.3d 1311, 1318-1319 (11th Cir. 2006). "[O]fficial action will not be held unconstitutional solely because it results in a ... disproportionate impact.... Proof of ... discriminatory intent or purpose is required to show a violation of the Equal Protection Clause." *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 264-265 (1977). "'Discriminatory purpose' ... implies more than intent as volition or intent as awareness of consequences. It implies that the decision maker ... selected ... a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Personnel Administrator of Massachusetts v. Feeney*, 442 U.S. 256, 279 (1979) (footnote and citation omitted); *see also Hernandez v. New York*, 500 U.S. 352, 359 (1991). Evidence which merely indicates disparity of treatment or even arbitrary administration of state powers, rather than instances of

purposeful or invidious discrimination, is insufficient to show discriminatory intent. *McKleskey v. Kemp,* 481 U.S. 279, 292, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987).

Initially, the court notes that Norsworthy fails to identify any similarly situated inmate nor does he allege how the defendants acted in a more favorable manner towards any other inmate. Thus, "[Norsworthy's] equal protection claim necessarily fails first because he has not shown that he was treated differently from other, similarly situated prisoners." *Sweet*, 467 F.3d at 1319. Additionally, Norsworthy fails to meet his pleading burden as he does not allege that the defendants subjected him to adverse treatment based on some constitutionally impermissible reason; rather, he simply makes the conclusory assertion that the defendants discriminated against him.

Other than his conclusory allegation of discrimination, Norsworthy produces nothing which suggests that the defendants took any action against him based on a constitutionally protected interest. Based on the foregoing, the court concludes that Norsworthy's claim of discrimination does not rise to the level of an equal protection violation and therefore provides no basis for relief in this 42 U.S.C. § 1983 action. Consequently, the defendants are entitled to summary judgment on this claim.

### H. Deliberate Indifference to Safety

Norsworthy alleges that the correctional defendants failed to properly train and supervise him with respect to his job at the Elmore Recycling Center. The court construes this assertion as a claim of deliberate indifference to the plaintiff's safety arising under the

Eighth Amendment. The correctional defendants adamantly deny acting with either callous disregard or deliberate indifference to Norsworthy's safety.

A correctional official may be held liable under the Eighth Amendment for acting with "deliberate indifference" to an inmate's safety when the official knows the inmate faces "a substantial risk of serious harm" and with such knowledge disregards the risk by failing to take reasonable measures to abate it. *Farmer v. Brennan*, 511 U.S. 825, 828 (1994). A constitutional violation occurs only "when a substantial risk of serious harm, of which the official is subjectively aware, exists and the official does not 'respond[] reasonably to the risk.' *Farmer v. Brennan*, 511 U.S. 825, 114 S.Ct. 1970, 1982-83, 128 L.Ed.2d 811 (1994). A plaintiff must also show that the constitutional violation caused his injuries." *Marsh v. Butler County*, 268 F.3d 1014, 1028 (11th Cir. 2001) (en banc).

In *Farmer*, the Court identified both objective and subjective elements necessary to establish an Eighth Amendment violation. With respect to the requisite objective elements, an inmate must first show "an objectively substantial risk of serious harm ... exist[ed]. Second, once it is established that the official is aware of this substantial risk, the official must react to this risk in an objectively unreasonable manner." *Marsh*, 268 F.3d 1028-1029. As to the subjective elements, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.... The Eighth Amendment does not outlaw cruel and unusual 'conditions'; it outlaws cruel and unusual 'punishments.' ... **[A]n official's failure to**

22

**alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment**." *Farmer*, 511 U.S. at 837-838 (emphasis added); *Campbell v. Sikes*, 169 F.3d 1353, 1364 (11th Cir. 1999) (citing *Farmer*, 511 U.S. at 838) ("Proof that the defendant should have perceived the risk, but did not, is insufficient."); *Cottrell v. Caldwell*, 85 F.3d 1480, 1491 (11th Cir. 1996) (same).  The conduct at issue "must involve more than ordinary lack of due care for the prisoner's interests or safety....  It is **obduracy and wantonness, not inadvertence or error in good faith**, that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause, whether that conduct occurs in connection with establishing conditions of confinement, supplying medical needs, or restoring official control over a tumultuous cellblock."  *Whitley v. Albers*, 475 U.S. 312, 319 (1986) (emphasis added).

> To be deliberately indifferent, Defendants must have been "subjectively aware of the substantial risk of serious harm in order to have had a '"sufficiently culpable state of mind."'" *Farmer*, 511 U.S. at 834-38, 114 S.Ct. at 1977-80; *Wilson v. Seiter*, 501 U.S. 294, 299, 111 S.Ct. 2321, 2324-25, 115 L.Ed.2d 271 (1991)....  Even assuming the existence of a serious risk of harm and legal causation, the prison official must be aware of specific facts from which an inference could be drawn that a substantial risk of serious harm exists - and the prison official must also "draw that inference." *Farmer*, 511 U.S. at 837, 114 S.Ct. at 1979.

*Carter v. Galloway*, 352 F.3d 1346, 1349 (11th Cir. 2003).  "The known risk of injury must be a strong likelihood, rather than a mere possibility before a [correctional official's] failure to act can constitute deliberate indifference." *Brown v. Hughes*, 894 F.2d 1533, 1537 (11th

23

Cir. 1990) (citations and internal quotations omitted).  As the foregoing makes clear, "[m]erely negligent failure to protect an inmate ... does not justify liability under section 1983...."  *Id*.

Pursuant to the aforementioned criteria, Norsworthy is "required to produce sufficient evidence of (1) a substantial risk of serious harm; (2) the defendants' deliberate indifference to that risk; and (3) causation[]" in order to survive summary judgment on his deliberate indifference claim.  *Hale v. Tallapoosa County*, 50 F.3d 1579, 1582 (11th Cir. 1995); *Farmer*, 511 U.S. at 837-838 (To avoid entry of summary judgment on a properly supported motion, plaintiff must produce sufficient evidence which demonstrates (1) an objectively substantial risk of serious harm; (2) a subjective awareness of this risk on the part of the defendants; (3) the defendants responded to such risk in an objectively unreasonable manner; and (4) the actions/omissions of the defendants caused his injuries); *Marsh*, 268 F.3d at 1028-1029 (same).  No genuine issue of material fact exists in this case because the record taken as a whole could not lead a rational trier of fact to find for Norsworthy.  *Scott*, 550 U.S. at 380; *Matsushita*, 475 U.S. at 586-587.

While it is unfortunate that Norsworthy suffered an injury to his finger while working at the Elmore Recycling Center, the record is completely devoid of evidence that the action about which he complains occurred due to deliberate indifference on the part of the correctional defendants.  Norsworthy presents no evidence of an objectively substantial risk of serious harm, nor is there any evidence demonstrating an actual, subjective

24

awareness of a substantial risk of such harm by these defendants, each of which is a required element of his Eighth Amendment claim. Neither the assertion that the defendants should have known of potential dangers/deficiencies at the recycling plant nor the mere possibility Norsworthy could be injured while working at the plant is enough to demonstrate a genuine issue regarding deliberate indifference on the part of the correctional defendants. *Brown*, 894 F.2d 1537. "Plaintiff has failed to establish that the Defendant[s] had a subjective awareness of a substantial risk of serious physical [harm] to Plaintiff; thus, Plaintiff has failed to establish a required element of this claim. When viewing the evidence most favorably toward Plaintiff, a claim for deliberate indifference has not been established...." *Carter*, 352 F.3d at 1350 (footnote omitted). Thus, summary judgment is due to be granted in favor of the defendants on this claim. *Id*.

## I. Denial of Adequate Medical Treatment

Norsworthy contends that correctional and medical personnel failed to provide him immediate treatment for the injury to his finger and denied him adequate treatment upon his positive test result for the Hepatitis B core antibody. Specifically, Norsworthy alleges that defendant Miller failed to immediately transport him to the health care unit when he injured his finger and maintains that once he reached the health care unit he waited another two hours before medical personnel examined him. Norsworthy further complains that the medical defendants did not refer him to a free-world medical facility for testing and delayed treatment/follow-up testing upon the positive result for Hepatitis B which occurred in

February of 2007.  He also maintains that medical personnel should have provided him a copy of his negative blood analysis obtained in December of 2007 instead of merely advising him orally of these results.

To prevail on a claim concerning an alleged denial of adequate medical treatment, an inmate must, at a minimum, show that the defendants acted with deliberate indifference to his serious medical needs.  *Estelle v. Gamble*, 429 U.S. 97 (1976); *Taylor v. Adams*, 221 F.3d 1254 (11th Cir. 2000);  *McElligott v. Foley*, 182 F.3d 1248 (11th Cir. 1999); *Waldrop v. Evans*, 871 F.2d 1030, 1033 (11th Cir. 1989); *Rogers v. Evans*, 792 F.2d 1052, 1058 (11th Cir.1986).  Specifically, prison officials and medical personnel may not subject an inmate to "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs."  *Estelle*, 429 U.S. at 106, 97 S.Ct. at 292; *Mandel v. Doe*, 888 F.2d 783, 787 (11th Cir.1989).  When seeking relief based on deliberate indifference, an inmate is required to establish "an objectively serious need, an objectively insufficient response to that need, subjective awareness of facts signaling the need and an actual inference of required action from those facts."  *Taylor*, 221 F.3d at 1258; *McElligott*, 182 F.3d at 1255 (for liability to attach, the official must know of and then disregard an excessive risk to the prisoner).  Thus, deliberate indifference occurs only when a defendant "knows of and disregards an excessive risk to inmate health or safety; the [defendant] must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists and he must also draw the inference."  *Farmer*, 511 U.S. at 837; *Johnson v. Quinones*,

145 F.3d 164, 168 (4th Cir. 1998) (defendant must have actual knowledge of a serious

condition, not just knowledge of symptoms, and ignore known risk to serious condition to

warrant finding of deliberate indifference).  Furthermore, "an official's failure to alleviate

a significant risk that he should have perceived but did not, while no cause for

commendation, cannot under our cases be condemned as the infliction of punishment."

*Farmer*, 511 U.S. at 838.

> In articulating the scope of inmates' right to be free from deliberate
> indifference, ... the Supreme Court has ... emphasized that not 'every claim
> by a prisoner that he has not received adequate medical treatment states a
> violation of the Eighth Amendment.'  *Estelle,* 429 U.S. at 105, 97 S.Ct. at
> 291; *Mandel,* 888 F.2d at 787.  Medical treatment violates the eighth
> amendment only when it is 'so grossly incompetent, inadequate, or excessive
> as to shock the conscience or to be intolerable to fundamental fairness.'
> *Rogers,* 792 F.2d at 1058 (citation omitted).  Mere incidents of negligence or
> malpractice do not rise to the level of constitutional violations.  *See Estelle,*
> 429 U.S. at 106, 97 S.Ct. at 292 ('Medical malpractice does not become a
> constitutional violation merely because the victim is a prisoner.'); *Mandel*,
> 888 F.2d at 787-88 (mere negligence or medical malpractice 'not sufficient'
> to constitute deliberate indifference); *Waldrop,* 871 F.2d at 1033 (mere
> medical malpractice does not constitute deliberate indifference).  Nor does
> a simple difference in medical opinion between the prison's medical staff and
> the inmate as to the latter's diagnosis or course of treatment support a claim
> of cruel and unusual punishment.  *See Waldrop,* 871 F.2d at 1033 (citing
> *Bowring v. Godwin,* 551 F.2d 44, 48 (4th Cir.1977)).

*Harris v. Thigpen*, 941 F.2d 1495, 1505 (11th Cir. 1991); *Taylor v. Adams*, 221 F.3d 1254,

1258 (11th Cir. 2000) (citation and internal quotations omitted) (To show deliberate

indifference to a serious medical need, a plaintiff must demonstrate that [the] defendants'

response to the need was more than "merely accidental inadequacy, negligence in diagnosis

or treatment, or even medical malpractice actionable under state law.").  Moreover,

"whether government actors should have employed additional diagnostic techniques or forms of treatment 'is a classic example of a matter for medical judgment' and therefore not an appropriate basis for liability under the Eighth Amendment." *Adams v. Poag*, 61 F.3d 1537, 1545 (11th Cir. 1995); *Garvin v. Armstrong*, 236 F.3d 896, 898 (7th Cir. 2001) ("A difference of opinion as to how a condition should be treated does not give rise to a constitutional violation."); *Hamm v. DeKalb County*, 774 F.2d 1567, 1575 (11th Cir. 1985) (mere fact inmate desires a different mode of medical treatment does not amount to deliberate indifference violative of the Constitution); *Franklin v. Oregon*, 662 F.2d 1337, 1344 (9th Cir. 1981) (prison medical personnel do not violate the Eighth Amendment simply because their opinions concerning medical treatment conflict with that of the inmate-patient). Further, self-serving statements by a plaintiff do not create a question of fact in the face of contradictory, contemporaneously created medical records. *See Bennett v. Parker*, 898 F.2d 1530 (11th Cir. 1990).

When an inmate's deliberate indifference claim relates to a delay in treatment, this court must consider "(1) the seriousness of the medical need; (2) whether the delay worsened the medical condition; and (3) the reason for the delay." *Goebert v. Lee County*, 510 F.3d 1312, 1327 (11th Cir. 2007). In a case alleging that delay in medical treatment shows deliberate indifference, the plaintiff "must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment to succeed." *Hill v. DeKalb Regional Youth Detention Center*, 40 F.3d 1176, 1187-1188 (11th Cir. 1994),

28

*overruled in part on other grounds*, *Hope v. Pelzer*, 536 U.S. 730, 739 n.9, 122 S.Ct. 2508, 2515 n.9 (2002). Any challenged "delay in medical treatment must be interpreted in the context of the seriousness of the medical need [and] deciding whether the delay worsened the medical condition...." *Id*. at 1189.

The records filed herein demonstrate that at approximately 2:00 p.m., within a few hours of Norsworthy's being stuck by an unknown object at the recycling plant, correctional officials transported him to the health care unit for examination. After he waited a couple of hours at the health care unit, the on-duty nurse examined Norsworthy's finger. The nurse noted no bleeding, no swelling, no redness, no drainage and no signs of any acute distress. *Correctional Defendants' Exhibit A to the May 28, 2008 Special Report (Medical Evaluation Form) - Court Doc. No. 25-1* at 3. The following day, medical personnel obtained a blood sample from Norsworthy for use in testing for infectious diseases. Medical personnel referred this sample and other subsequent blood samples obtained from Norsworthy to outside laboratories for requisite testing. The undisputed evidentiary materials before the court further demonstrate that the medical staff at Staton routinely examined Norsworthy through the chronic care clinic, thoroughly evaluated his complaints, obtained several blood samples for continued testing regarding possible exposure to infectious diseases, responded to his requests regarding the positive test result for the Hepatitis B antibody, monitored his condition, consulted Norsworthy with respect to the test results and provided treatment to him in accordance with their professional

29

judgment. *Medical Defendant's Exhibit B to the May 6, 2008 Special Report (Medical Records of Larry Norsworthy.) - Court Doc. No. 18-2* at 6-142; *Medical Defendants' Exhibit A to the June 25, 2008 Special Report - Court Doc. No. 30-1* at 1-128 and *Court Doc. No. 30-2* at 1-146.

The affidavits filed by defendants Corbier and Guice address the allegations made against them by Norsworthy.  A thorough review of the evidentiary materials filed in this case demonstrates that these affidavits are corroborated by the objective medical records compiled contemporaneously with the treatment provided to Norsworthy.  Dr. Corbier delineates the relevant treatment provided to Norsworthy as follows:

> I recall examining and overseeing the medical care sought and received by Larry Norsworthy. I specifically recall the incident in approximately August of 2006 when Mr. Norsworthy claimed that his hand was injured or cut while he was working in the recycling plant at Elmore Correctional Facility.  As indicated in his medical records, Mr. Norsworthy reported to the Health Care Unit at Staton on August 30, 2006, and informed the medical staff that he "was at work recycling trash [and] something stuck him in his finger [but] isn't sure what stuck him."  At that time, the medical staff did not see any blood or redness where he claimed to have been stuck. In the event that an inmate suffers a percutaneous injury, such as Mr. Norsworthy's alleged injury while working in the recycling plaint, the medical staff at Staton is directed to follow a specific protocol for the monitoring of the patient's overall condition, which primarily involves testing for infectious diseases.  As indicated in the "Emergency" form completed by the medical staff on August 30, 2006, the medical staff at Staton followed this protocol by entering orders for Mr. Norsworthy to return to the health care unit on October 11, 2006, November 22, 2006, and February 13, 2006 for "labs to be drawn" for "percutaneous injury tracking."
>
> The initial labs completed for Mr. Norsworthy during 2006 did not demonstrate any abnormalities of any kind.  However, the lab tests reported on February 16, 2007, demonstrated a "positive" result for the Hepatitis B core antibody.  Hepatitis B is a viral infection spread through contact with

infected blood and other bodily fluids such as semen, vaginal secretions, saliva, open sores, and breast milk. Patients infected with Hepatitis B often will fight off the infection successfully within a few weeks or months, developing an immunity to the infection itself that lasts a lifetime. A positive lab test could also result if an individual was exposed to the Hepatitis B virus but simply did not become infected. This is particularly true in instances such as Mr. Norsworthy's where he had previously received a vaccination for Hepatitis B. For this reason, an initial positive lab result does not automatically mandate treatment. Rather, follow-up testing is required in order to confirm that an infection is not resolved by the human immune system. In order to be considered a "carrier" of this infection, a patient must test positive for the infection over at least a six-month period of time. In the event of repeated positive lab findings, treatment may be necessary to treat a chronic or serious infection. In the case of Mr. Norsworthy, he tested positive in February of 2007, but subsequent lab tests confirmed that either (1) his immune system adequately suppressed and destroyed the infection, or (2) the positive finding was an error. Ultimately, Mr. Norsworthy was informed of the negative results of his lab tests and no further treatment of any kind was warranted. In short, it is impossible to know why Mr. Norsworthy tested positive for Hepatitis B in February of 2007, but the following findings do confirm that he is not infected with this disease and does not require any form of further medical treatment of any kind.

In reviewing the Complaint, I noticed a description of a conversation on March 1, 2007 in the health care unit at Staton. Mr. Norsworthy's description of this conversation is wrong. I was not present during the course of the examination and have not stated at any time that the "positive" finding was a result of the August, 2006, incident when Mr. Norsworthy claims he was stuck in the hand by some object.

* * *

I have not at any time ignored any request by Mr. Norsworthy for medical treatment. I have not deliberately ignored any medical complaints made by Mr. Norsworthy or interfered in any way with the provision of medical care to Mr. Norsworthy at any time. I have not taken any action which has caused Mr. Norsworthy to experience any unnecessary pain and/or suffering.

*Medical Defendants' Exhibit A to the May 6, 2008 Special Report (May 5, 2008 Affidavit*

*of Dr. Paul A. Corbier) - Court Doc. No. 18-1 at 3-4, 7.*

I was recently notified that Mr. Larry Norsworthy is currently alleging that, when he was evaluated on August 30, 2006, the member of the medical staff conducting the evaluation had difficulty locating supplies to obtain a blood sample for lab testing. I have never been notified by any member of the medical staff at Staton or Draper that they could not obtain a blood sample due to being unable to locate the necessary supplies. I was not present during the [initial] evaluation of Mr. Norsworthy on August 30, 2006, or consulted by any member of the medical staff regarding the initial evaluation of Mr. Norsworthy on August 30, 2006. I was not present during his March 1, 2007, appointment with Nurse Guice.

Whether Mr. Norsworthy's blood sample was drawn on the afternoon of August 30, 2006, or the morning of August 31, 2006 (as indicated [by his medical records]) is irrelevant. The timing of any lab testing for hepatitis B would not dictate a positive or negative result. In evaluating Mr. Norsworthy's medical condition, the medical staff took immediate steps to begin monitoring and set a schedule to monitor through lab testing whether Mr. Norsworthy had contracted any virus or disease or developed any medical condition as a result of the August 30, 2006, incident, which is consistent with the prevailing standard for treatment and evaluation of these precutaneous injuries. The medical records regarding the August 31, 2006, evaluation of Mr. Norsworthy indicate that the medical staff promptly set a schedule for testing and blood samples were drawn and submitted to the lab on August 31, 2006, which initially provided a negative result....

Mr. Norsworthy never notified me that he had not reported to the Health Care Unite for the requisite lab testing [as directed by medical personnel]. Between August 16, 2006, and March 23, 2008, Mr. Norsworthy submitted 21 sick call request forms. He did not mention anything regarding hepatitis B in any sick call request form until March 4, 2007, when he requested information regarding his options. In fact, the treatment options remained unknown at that time due to the recent positive lab result and additional lab testing would be required after a period of months to confirm that he was a "carrier" of this virus. Mr. Norsworthy did not submit another sick call request form until December 26, 2007, referencing in any way hepatitis B. Prior to this December 26, 2007, sick call request form, Mr. Norsworthy did not mention anything regarding any concern or request regarding hepatitis B during my interactions with him. Following the submission of this sick call request form, Mr. Norsworthy was again tested for hepatitis B, which resulted in a negative finding and provided confirmation that his immune system had successfully defeated any potential infection and further treatment of any kind was not warranted.

> I do not have any reason of any kind to believe that the lab services historically utilized by [the medical care providers for the Alabama Department of Corrections] are or were unreliable in any way.... Indeed, if Mr. Norsworthy had been transported to a local medical facility for lab testing, it is almost certain that the *same* lab utilized by the medical staff at Staton would have conducted the testing on his lab sample.

*Medical Defendants' Exhibit 2 to the October 13, 2008 Supplemental Special Report (October 10, 2008 Supplemental Affidavit of Dr. Paul A. Corbier) - Court Doc. No. 45-1* at 8-10 (citations to medical records omitted and emphasis in original).

Nurse Guice likewise maintains, "I was not present when Mr. Norsworthy was evaluated on August 30, 2006. I was not consulted in any way during this initial evaluation ... [and] was not notified of any difficulties in obtaining a blood sample from Mr. Norsworthy.... In my personal experience, the Health Care Unit at Staton maintains an adequate supply of all syringes, vials and other equipment necessary to obtain a blood sample from a patient. I have never been notified by any member of the medical staff at Staton that they could not obtain a blood sample due to being unable to locate the necessary supplies." *Medical Defendants' Exhibit 1 to the October 13, 2008 Supplemental Special Report (October 10, 2008 Supplemental Affidavit of Domineek Guice) - Court Doc. No. 45-1* at 5. In addition, nurse Guice states:

> I recall evaluating and treating inmate Larry Norsworthy during his incarceration at Staton. In approximately February of 2007, Mr. Norsworthy's lab work was reviewed and I noticed a positive Hepatitis B core antibody. I scheduled for him to repeat the lab in three months and come to the health care unit to talk with me in March of 2007, to discuss the lab work. The pre-scheduled February lab tests showed a "positive" result with regard to the Hepatitis B core antibody, meaning that the lab report

indicated that Mr. Norsworthy may have been exposed to the Hepatitis B virus. I was not responsible for any of the samples drawn for any of the lab tests obtained with regard to Mr. Norsworthy. As mentioned, upon seeing the results from the February 2007 lab tests, Mr. Norsworthy was summoned to the Health Care Unit on March 1, 2007, for an appointment with me to allow me an opportunity to notify Mr. Norsworthy of these findings and to provide him some information as to the meaning of this finding. During the course of my appointment with Mr. Norsworthy, I informed him of the positive result and told him that because this result related to a possible exposure to Hepatitis B that subsequent lab testing would be required in three months. During my chronic care visit with Mr. Norsworthy in January of 2008, he expressed some concerns of his "Hepatitis B" status. Prior to this visit, he did not express any misunderstanding of the information/lab findings which were provided to him in March of 2007. In January 2008, I explained to Mr. Norsworthy that he was not Hepatitis B positive and reinforced its mode of transmission, and that his subsequent 12/08/07 hepatitis panel tests were negative. I was concerned about his misunderstanding of the March 2007 information provided to him; therefore, I referred him to speak with Dr. Paul Corbier.

The description in Mr. Norsworthy's Complaint of my March 1, 2007, appointment with him is not accurate or complete. I explained to Mr. Norsworthy in March 2007, the mode of transmission of the three most commonly tested Hepatitis viruses A, B and C. During our March 2007 visit, he did not express any misunderstanding of the information given. In Mr. Norsworthy's Complaint, he indicated that he was Hepatitis B positive. However, subsequent lab tests in December 2007, demonstrated that his Hepatitis tests ultimately did not indicate any serious or chronic infection with Hepatitis B and showed no evidence of a persistent positive Hepatitis B core antibody. Mr. Norsworthy was notified of these subsequent lab findings [in January of 2008]. Given these results, there was no need to provide Mr. Norsworthy with any treatment of any kind at that time.

*Medical Defendants' Exhibit B to the May 6, 2008 Special Report (May 5, 2008 Affidavit*

*of Domineek Guice) - Court Doc. No. 18-2* at 3-4. Nurse Guice also asserts that after she

"notified Mr. Norsworthy of his positive hepatitis B core antibody in February of 2007 and

the need for follow-up testing after the passage of time, Mr. Norsworthy did not notify me

that he had failed to report to the Health Care Unite for any of the follow-up testing. This one positive hepatitis B core antibody did not necessarily mean he was infected with hepatitis B. Mr. Norsworthy's December, 2007, lab testing was completed after he requested this testing from another member of the medical staff in December of 2007. He never mentioned any additional lab testing in his discussions with me until approximately January of 2008, months after our February, 2007, conversation when I instructed him to return to the Health Care Unite for follow-up testing." *Medical Defendants' Exhibit 1 to the October 13, 2008 Supplemental Special Report (October 10, 2008 Supplemental Affidavit of Domineek Guice) - Court Doc. No. 45-1* at 5.

1. Delay in Transporting/Examining Plaintiff. In this case, the evidence, even when viewed in the light most favorable to Norsworthy, fails to establish deliberate indifference with respect to the alleged delays in transporting Norsworthy to the health care unit and providing treatment once he arrived at this unit. It is undisputed that Norsworthy suffered only a prick to his finger while working at the recycling plant and there is no evidence before the court that either delay about which Norsworthy complains in any way worsened this injury or any related condition; rather, the only evidence before the court demonstrates that neither the injury nor condition was impacted by the challenged delays. Consequently, the delays in providing medical treatment do not rise to the level of deliberate indifference and the defendants are therefore entitled to summary judgment on these claims.

2. Treatment for Hepatitis B. Under the circumstances of this case, it is clear that

the course of treatment undertaken by the medical defendants did not violate Norsworthy's constitutional rights.  The medical care and information Norsworthy received was adequate and certainly not "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to the fundamental fairness."  *Harris*, 941 F.2d at 1505.  Although Norsworthy asserts that he should have been referred to a free-world facility for blood testing, this assertion fails to establish deliberate indifference.  *Garvin*, 236 F.3d at 898 (difference of opinion regarding manner in which condition should be treated fails to demonstrate a constitutional violation); *Adams*, 61 F.3d at 1545 (whether medical personnel "should have employed additional ... forms of treatment 'is a classic example of a matter for medical judgment' and therefore not an appropriate basis for liability under the Eighth Amendment.");  *Hamm*, 774 F.2d at 1505 (inmate's desire for some other form of medical treatment does not constitute deliberate indifference violating the Constitution); *Franklin*, 662 F.2d at 1344 (simple divergence of opinions between medical personnel and inmate-patient do not violate the Eighth Amendment).  It is undisputed that Norsworthy received medical treatment for the injury to his finger and underwent multiple rounds of blood tests with respect to possible exposure to infectious diseases.  Based on well-settled law cited herein, his mere desire for a different mode of medical treatment does not amount to deliberate indifference.  Norsworthy has failed to present any evidence which indicates that the defendants knew the manner in which medical personnel treated his injury/potential exposure to an infectious disease created a substantial risk to his health and that with this

knowledge consciously disregarded such risk.   The record is devoid of evidence, significantly probative or otherwise, showing that the defendants acted with deliberate indifference to Norsworthy's injury or his positive test result for the Hepatitis B core antibody.   Consequently, summary judgment is due to be granted in favor of the defendants.  *Carter*, 352 F.3d at 1350.

## J.  State Law Claims

To the extent Norsworthy asserts claims alleging that defendants violated various state laws, review of these claims is appropriate only upon exertion of this court's supplemental jurisdiction.   In the posture of this case, however, the exercise of such jurisdiction is inappropriate.

For a federal court "[t]o exercise [supplemental] jurisdiction over state law claims not otherwise cognizable in federal court, 'the court must have jurisdiction over a substantial federal claim and the federal and state claims must derive from a "common nucleus of operative fact."'"  *L.A. Draper and Son v. Wheelabrator Frye, Inc.*, 735 F.2d 414, 427 (11th Cir. 1984).   The exercise of supplemental jurisdiction is completely discretionary.  *United Mine Workers v. Gibbs*, 383 U.S. 715 (1966).  "If the federal claims are dismissed prior to trial, *Gibbs* strongly encourages or even requires dismissal of the state claims."  *L.A. Draper and Son*, 735 F.2d at 428.  In view of this court's resolution of the federal claims presented in the complaint, Norsworthy's pendent state claims are due to be dismissed.  *Gibbs,* 383 U.S. at 726 (if the federal claims are dismissed prior to trial,

the state claims should be dismissed as well); *see also Ray v. Tennessee Valley Authority*, 677 F.2d 818 (11th Cir. 1982).

## IV.  CONCLUSION

Accordingly, it is the RECOMMENDATION of the Magistrate Judge that:

1.  The defendants' motions for summary judgment be GRANTED.

2.  Judgment be GRANTED in favor of the defendants.

3.  This case be dismissed with prejudice.

4.  The costs of this proceeding be taxed against the plaintiff.

It is further

ORDERED that on or before December 28, 2010 the parties may file objections to this Recommendation. Any objections filed must clearly identify the findings in the Magistrate Judge's Recommendation to which the party is objecting. Frivolous, conclusive or general objections will not be considered by the District Court. The parties are advised that this Recommendation is not a final order of the court and, therefore, it is not appealable.

Failure to file written objections to the proposed findings and advisements in the Magistrate Judge's Recommendation shall bar the party from a de novo determination by the District Court of issues covered in the Recommendation and shall bar the party from attacking on appeal factual findings in the Recommendation accepted or adopted by the District Court except upon grounds of plain error or manifest injustice. *Nettles v.*

*Wainwright*, 677 F.2d 404 (5th Cir. 1982). *See Stein v. Reynolds Securities, Inc.*, 667 F.2d 33 (11th Cir. 1982). *See also Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981, *en banc*), adopting as binding precedent all decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

Done, this 15th day of December, 2010.

/s/ Susan Russ Walker
SUSAN RUSS WALKER
CHIEF UNITED STATES MAGISTRATE JUDGE